## McMILLAN v. BAILEY–DARBY COAL CORP. et al.

Court of Appeals of Kentucky.

May 2, 1952.

Rehearing Denied Oct. 10, 1952.

James S. Greene, Jr., Harlan, for appellant.

James Sampson, Harlan, for appellees.

CULLEN, Commissioner.

This appeal involves a controversy between the owner of the timber rights, and the lessee of the coal rights, in a tract of 1600 acres situated on the west side of Big Black Mountain in Harlan County.

The owner of the timber rights, A. Dale McMillan, who was the plaintiff below in a declaratory judgment action, is appealing from a judgment which found that he could not cut and remove the timber from the tract in question without materially interfering with the mining operations of the defendant, Bailey-Darby Coal Corporation, but which granted to McMillan the right to cut and remove the timber, notwithstanding such material interference, upon his executing a bond conditioned that he would pay all damages resulting from such interference and further conditioned that he would comply with certain specified requirements in conducting his logging operations.

The controversy grows out of the terms of the instruments under which the parties acquired their respective rights.

The coal company acquired its rights under a lease from the owners of the tract of land in question, dated August 24, 1945. The lease is for a term of 30 years, or until all the coal is mined out. The lessee is granted the right and privilege, during the term of the lease, of mining coal and of constructing necessary facilities for coal mining operations, and the lessee is further given the right to use all timber upon the land measuring 15 inches in diameter or less, except poplar and locust, necessary for mining purposes. The lease provides that the lessee "shall have said premises for the purposes set forth in this lease without let or hindrance from the lessors and free from any person or persons claiming the same, or any part thereof." However, the lease recites that it is contemplated by the parties that the lessor may desire to cut and remove the timber other than that granted to the lessee, and therefore the lessor reserves the right to bring logs to the side tracks on the coal mining operations and load the logs on railroad cars, provided that such loading will not interfere with the lessee in the mining and shipping of coal. The lease calls for a royalty of 30¢ per ton, with a minimum royalty of $25,000 per year.

Immediately following the execution of the coal lease, the coal company entered upon the premises and commenced its mining development, the nature and extent of which will be hereinafter described.

On September 27, 1946, the owners of the tract of land sold to McMillan all timber on the tract measuring 16 inches or more in diameter, except locust. The contract of sale included the following provisions:

"It is understood and agreed by the parties hereto that second party shall have full rights of ingress and egress and necessary rights-of-ways in, over and through the lands upon which the timber is situated by which second party may remove said timber. However, this contract of sale is executed with full knowledge of the coal lease of August 24, 1945, between Turner Fuel Company, Henry Turner and Amanda Turner, his wife, of the first part, and Bailey-Darby Coal Corporation, of the second part, wherein and whereby said Turner Fuel Company, Henry Turner and Amanda Turner leased the coal underlying the land upon which the timber is situated and this sale is executed subject to all the rights granted in that coal lease, which said coal lease shall be regarded as superior to this contract of sale if there is any conflict between the two.

"It is agreed by the parties that in using the right-of-way herein granted and in cutting and removing the timber herein sold such work by second party shall be done and such rights-of-ways to be used shall be used so as not to conflict or interfere with the lessee in the coal lease in the mining and operating of the coal underlying the land.

"Second party is granted the right to erect and maintain saw mill sites, stacking grounds for lumber, skidways, dumps and the like wherever necessary or expedient on the premises, but such will not be constructed or erected or maintained as will interfere with the lessee in the coal lease, its successors and assigns, from mining and shipping the coal embraced in said lease.

"It is further understood between the parties that the right to use the

timber on these premises which measures 15 inches in diameter and down has been granted to Bailey-Darby Coal Corporation under the above named coal lease, and therefore no rights are granted to second party in any way as to the timber on said premises which measures 15 inches in diameter and down. While second party is granted the right to build roadways, haul roads, skidways and mill sites on the premises he shall not have the right to use any of the timber on the premises 15 inches and under.

\* . \* \* \* \* \*

"Under the coal lease hereinabove referred to certain rights were reserved by first parties and Turner Fuel Company to the use of the side tracks located on the mining operation. First parties hereby grant to second party such rights as they have in order that he may bring his timber products to the side tracks located on the operation and to load such products on the railroad cars without charge but at second party's own expense, but such loading shall at no time be permitted to interfere in any way with the Coal Company operating on the lease in the mining and shipping of its coal."

Sometime following the acquisition of the timber rights, Mr. McMillan and representatives of the Vestal Lumber and Manufacturing Company, to which company McMillan proposed to sell his timber rights, had some discussions and correspondence with the coal company concerning the commencement of logging operations. In one letter the Vestal Company offered to purchase from the coal company any timber less than 15 inches in diameter necessary to be cut in making roadways and skidways for logging purposes. The coal company took the position that the timber could not be cut and removed without materially interfering with the mining operations and declined to consider any agreement with the owner of the timber rights concerning the commencement and carrying on of logging. McMillan then brought the present action seeking a declaratory judgment as to the respective rights of the parties.

Considerable proof was taken, directed to the question of whether the timber could be cut and removed without interfering with the mining operations. From the proof it appears that the only way of bringing timber out would be down one of the three valleys made by the various forks of Bailey's Creek, which flow from the crest of the mountain to the bottom, where Bailey's Creek enters Clover Fork. The three forks are known as the left fork, the middle fork, and the right fork, the latter being in reality the main creek extended. The coal company has substantial installations on the left fork, where it has a number of entries in the Kellioka Seam.

The valley of the left fork from the foot of the mountain up to the entry is occupied by a haul road constructed by the coal company and used in trucking its supplies and equipment. Around the ridge of the mountain to the valley of the middle fork the coal company has constructed a grade for a tram road, and steel tracks for mine cars have been constructed on part of the grade. The company also has built roads up the valley of the middle fork and up the valley of the right fork, preparatory to commencement of mining operations in the seams outcropping on those forks.

The coal company has a large tipple located below the main creek between the left fork and the middle fork, and the main railroad track and side tracks for storing cars extend up the valley of the main creek. There was testimony that there was no room for additional railroad tracks, and that all railroad cars above the tipple would have to go under the tipple in order to reach the main line of the railroad. There also was testimony that the roads of the coal company up the middle fork and the right fork occupy the only space available for roads in the valleys made by these two forks.

It appears that the coal company has invested between $300,000 and $350,000 in its mining facilities, and is contemplating further extensive developments in the immediate future, leading towards an ultimate capacity of 1500 tons of coal per day. The present operations of the company are limited to the Kellioka Seam, but the company

contemplates working the Harlan Seam which is below the Kellioka Seam, and the Darby Seam which is above the Kellioka Seam. There was evidence that the mining operations might continue for as long as 75 or 100 years.

The evidence indicates that the major portion of the large timber which McMillan desires to remove is located above the existing and proposed mine entries of the coal company. A number of witnesses testified that the normal method of logging would involve cutting skidways up the mountain, 12 feet in width and 50 feet apart. At the foot of the skidways the logs would be loaded on trucks and hauled down the mountain to the railroad siding. Of necessity, this would require roadways down the valleys of the three forks of Bailey's Creek, and as previously indicated, the evidence on behalf of the coal company was to the effect that there was no way to come down the valleys except over the roads and past the installations of the coal company.

Several witnesses testified that in constructing the necessary skidways and in felling the large timber, between 50% and 75% of the timber less than 15 inches in diameter would be destroyed, this testimony of course having relation to the right of the coal company to use all of the timber of this size. There was further evidence as to the danger of flash floods and erosion resulting from the cutting of the large timber, and the fire hazard that would be created by leaving upon the land the tops, limbs and branches of the trees cut in the logging operations.

Upon the evidence, and after personally viewing the premises, the trial judge made the following findings of fact:

1. The coal company has the right to hold and develop the land for coal mining purposes "free from let or hindrance during the term of said lease".

2. The coal company has the right to use for its mining operation all timber on the land measuring 15 inches or less in diameter and has the right to use such timber without interference from the plaintiff.

3. The timber owned by the plaintiff can not be removed, and the rights granted to the plaintiff under the contract of sale of the timber can not be exercised "without materially interfering with the operation" of the coal company.

However, the court entered judgment declaring that the plaintiff has the right to remove the timber, "notwithstanding such material interference with the operation of the defendant," provided the plaintiff shall execute to the defendant a bond in the amount of $150,000 conditioned that plaintiff will pay any damages resulting from his interfering with the rights of the coal company, and containing these further conditions:

1. The plaintiff will pay to the coal company the prevailing market price for all timber 15 inches or less in diameter used or destroyed in constructing haul roads or skidroads or destroyed in felling the large timber.

2. The plaintiff will indemnify the coal company against the use of any of the coal company roads, and against any damages resulting from inadvertent use.

3. The plaintiff will fill all gullies or ditches made in logging the timber.

4. The plaintiff will remove from the premises all tops, limbs and branches cut from trees in the logging operation.

5. The plaintiff will indemnify the coal company against losses from any unforeseen accident or unforeseen event caused by the plaintiff in connection with the removal of timber.

The judgment further declared that plaintiff did not have the right to use any of the roads constructed by the coal company.

The main contention of the plaintiff, on this appeal, is that the judgment of the trial court is erroneous in requiring him to execute bond. It is contended that the bond provisions of the judgment have the effect of an injunction, and that the court had no jurisdiction or authority to grant injunctive relief because such relief was not asked

for in the pleadings of either party. It is argued that the judgment therefore extends beyond the purview of the Declaratory Judgment Act, Civ.Code Prac. § 639a–1 et seq., and beyond the scope of the pleadings.

■ We cannot agree that the judgment, in requiring a bond as a condition of removal of the timber, was injunctive in character, any more than any declaratory judgment declaring rights or determining legal relations can be said to be injunctive. Any declaratory judgment declaring rights or determining legal relations embodies the concept that the parties will thereafter govern their actions in accordance with the declaration of the judgment—otherwise a declaratory judgment would have no more force or effect than an advisory opinion. By this we do not mean to say that failure to comply with the terms of a declaratory judgment that is not phrased in terms of an injunction may be punished as a contempt, but certainly, after a binding declaration of rights has been made by a declaratory judgment, a party cannot treat the judgment as a mere piece of advice and proceed to attempt to exercise rights denied him by the judgment with the view that whether he can *exercise* the rights so denied him can be litigated separately from the question of whether he had the rights in the first instance.

In Black v. Elkhorn Coal Corporation, 233 Ky. 588, 26 S.W.2d 481, 483, the Kentucky Declaratory Judgment Act was held constitutional (as against the contention that it conferred nonjudicial power upon the courts), because the Act permits the courts to decide "only rights and duties about which there is a present actual controversy presented by adversary parties, and in which a binding judgment *concluding* the controversy may be entered. * * * (Our emphasis.)" Section 10 of the Act, section 639a–10 of the Civil Code of Practice, declares that the purpose of the Act is to make courts more serviceable to the people by way of "settling" controversies.

In the present action, the prayer of plaintiff's "petition in equity" was that the court "make a declaration and determination of the rights, duties, responsibilities and legal relations of this plaintiff and the defendants." Under this prayer, and under the terms of the Declaratory Judgment Act, the plaintiff must have contemplated that the court would make an adjudication having binding force and effect.

It must be remembered that the basic finding of fact made by the lower court was that the timber could not be cut and removed without materially interfering with the rights of the coal company. If the court had thereupon declared that the plaintiff had no right to enter and remove the timber, surely such a declaration would have been binding, conclusive and would have "settled" the controversy much more than the judgment that was entered; yet it would not be classified as an injunction.

■ We are unable to see how the plaintiff is in a position to complain of the fact that a bond was required of him as a condition of his being permitted to do something which the court found as a matter of fact he did not have the right to do. The judgment in effect permits the plaintiff to violate the rights of the defendant upon putting up a bond guaranteeing that the plaintiff will pay the damages that result from such violation. Ordinarily, the defendant would be entitled to injunctive relief against the character of violation of its rights involved in this case, rather than being relegated to a remedy by way of damages.

If the bond provisions of the judgment, which seem to be the only provisions of which the appellant complains, should be removed from the judgment by direction of this court, then obviously the appellant would be in a worse position than that in which he now finds himself.

■ The appellant complains of some of the specific conditions of the bond, contending they are unreasonable and unjustified. Concerning the requirements that ditches and gullies be filled, and that tops, limbs and branches be removed from the premises, it is argued that these requirements impose an undue burden upon the appellant, contrary to the established custom and practice in the timber industry, and that there is not sufficient evidence to show that any

interference with the defendant's operations would result from failure to meet the requirements. There was evidence as to increased danger of flash floods and water damage resulting from cutting skidways and creating ditches and gullies up the mountainside; and there was testimony as to increased fire hazard resulting from leaving tops, limbs and branches on the ground. Having in mind that there may have been some justification for imposing greater than ordinary duties upon the appellant as a condition of permitting him to interfere with defendant's rights, and in view of the evidence above mentioned, we cannot say that the imposed requirements are unreasonable.

Concerning the requirement that the appellant indemnify the defendant against loss from any "unforeseen accident or any unforeseen event," the appellant contends that this would make him responsible for accidents occurring without negligence on his part. This may be so, but the liability is expressly limited to damage "caused by the plaintiff in connection with the removal of the timber from said property," and it cannot be considered unreasonable to require the plaintiff to indemnify the coal company for damage that would not have occurred except for the removal of the timber.

The appellant maintains that the portion of the judgment setting forth the findings of fact is erroneous in declaring that the defendant has the right to hold the land "free from let or hindrance." The judgment follows the language of the defendant's lease, and we perceive no error in this respect.

It is further contended that the judgment is erroneous in declaring that the defendant has the right to use all of the timber measuring 15 inches or less in diameter, the contention being that the right should have been restricted to such of the timber as was necessary for the defendant's mining purposes. The judgment actually does so limit the right, because it uses the words "the right to use *for its mining operation* all timber on said land measuring 15 inches in diameter and down * * *. (Our emphasis.)"

The appellant's concluding argument is that the timber constitutes a valuable natural resource in the utilization of which the public has an interest, and it will be a public wrong to place the timber beyond the reach of the public. The answer to this is that coal is likewise a valuable natural resource, and we are faced with a finding of fact by the chancellor that the timber cannot be removed without materially interfering with the removal of the coal. There is no basis on which we can give the one resource greater importance to the public than the other.

The judgment is affirmed.